# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 CR 195-2 | **DATE** | June 13, 2002 |
| **CASE TITLE** | *United States of America v. Thomas P. Carroll* | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, 1) OVERRULES Defendant Carroll's objections to the PRS; (2) DENIES his Motion for an Downward Departure; (3) SUSTAINS the Government's objections to the PSR; and (4) GRANTS the Government's Motion for an Upward Departure. It is so ordered.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | JUN 17 2002 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | U.S. DISTRICT COURT CLERK | | | 120 |
| | Mail AO 450 form. | 02 JUN 14 PM 3: 58 | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| RTS | courtroom deputy's initials | FILED-ED IO | date mailed notice | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

UNITED STATES OF AMERICA,    )
                             )
                             )    **Hon. Blanche M. Manning**
            v.               )
                             )    **00 CR 195-2**
THOMAS P. CARROLL            )
                             )

## MEMORANDUM AND ORDER

This matter comes before the Court for the sentencing of Defendant Thomas P. Carroll,

who entered a blind plea of guilty to: (1) conspiracy to commit fraud against the United States

(Count I) (in violation of 18 U.S.C. § 371); (2) production of false United States visa documents

(Count II) (in violation of 18 U.S.C. § 1028 (a)(1) and (c)(1)); and (3) bribery of a public official

(Count III) (in violation of 18 U.S.C. § 201(b)(1)(a) and (2)). Presently before this Court are: (1)

Carroll's objections to the Presentence Investigation Report ("PSR") and motion for downward

departure; and (2) the Government's Motion for Upward Departure and objections to the PSR.

### BACKGROUND[1]

Prior to his arrest in the instant matter, Carroll worked in various capacities for the United

States State Department. From March 1998 to March 2000, Carroll was a vice counsel assigned

to the non-immigrant visa section at the United States Embassy in Georgetown, Guyana. As vice

counsel, Carroll issued non-immigrant Untied States visas (hereafter "visas"), which allow

foreign citizens to travel to the United States for brief periods of time for business or personal

reasons. In August 1998, soon after being assigned to the non-immigrant visa section, Carroll

---

[1]    The facts in the Background section are taken from the PSR and the evidence
presented at Carroll's sentencing hearing.

began illegally selling visas in exchange for bribes. This conduct continued for almost two years, until the time of Carroll's arrest on March 17, 2000. During this time, Carroll sold hundreds of visas. At $10,000 to $15,000 per visa, Carroll made well over a million dollars.

Over the course of the two year scheme, Carroll worked with a number of different "brokers" or "middlemen" who would pass along the visa applicants' names and a portion (generally about $6,000 to $8,000 for each visa) of the bribe money to Carroll. From August 1998 to November 1999, Carroll worked with a broker by the name of Rajesh Persaud. Next, Carroll used a visa broker named Donna Dos Santos, who paid Carroll $6,000 for each of 20 fraudulent visas. In December 1999, Carroll began working with Co-Defendant Haleem Kahn.

Carroll's relationship with Kahn would prove to be very lucrative. From December 1998 to March 1999, Carroll issued fraudulent visas to approximately 80 persons. Kahn charged $12,500 for each visa and passed along $8,000 to Carroll. Kahn also supplied the applicants with counterfeit documents to support the visa applications. During this time, Carroll also worked with other visa brokers including Eton Cordis and a person named Farouk.

In March 1999, Carroll's scheme ran into a roadblock when he was transferred from the non-immigrant visa section to another position at the United States Embassy in Guyana. In July 1999, however, Carroll was able to issue up to 50 more fraudulent visas when his replacement at the non-immigrant visa section, Benedict Wolf, was out of the office for one week.

In an effort to continue his illegal visa scheme, Carroll attempted to recruit Wolf to issue fraudulent visas in return for bribes. Carroll's brokers, Kahn and Cordis, offered Carroll $4,000 per visa if he could recruit Wolf. Unknown to Carroll, law enforcement officials, who were investigating his illegal activities, had recruited Wolf to work as an informant and to tape record

his conversations with Carroll. In March 2000, Carroll, Kahn, and Wolf agreed that Wolf would issue 250 visas in one month in exchange for $1,000,000. After this deal was agreed upon, Carroll and Kahn were arrested on March 17, 2000, and the scheme came to an end.

Seven days after being arrested, Carroll and the Government initiated a series of at least nine proffer sessions. As documented in a 20 page memorandum completed by the Government, Carroll provided the Government with details and names of other persons who participated in the fraudulent visa scheme.

In the summer of 2000, after his proffer sessions, Carroll and his attorneys, at that time, entered into plea negotiations. Despite several months of plea negotiations, the parties could not agree upon a plea. During the course of negotiations, the Government offered Carroll a signed plea agreement. Carroll, however, was not satisfied with the proposed agreement and refused to sign it. The sticking point for Carroll was that the Government would not agree to move the Court for a downward departure based on "substantial assistance" pursuant to United States Sentencing Guideline ("USSG" or "the Guidelines") section 5K1.1. Carroll believed that he qualified for a downward departure under section 5K1.1 because of the information he provided to the Government in his proffer sessions.

After rejecting the Government's proposed plea agreement, Carroll entered a blind plea to all three counts on April 6, 2001. Before pleading guilty, this Court clearly and carefully explained to Carroll that the Government would not be bound by any sentencing calculations in the proposed but unsigned plea agreement and that his ultimate sentence would be based upon his PSR and the findings of the Court. Furthermore, the Government specifically explained to Carroll that because he had rejected the proposed plea agreement, it could recalculate the amount

3

of loss for sentencing which could result in a higher base offense level. Despite these warnings, Carroll voluntarily pled guilty to all three counts of the indictment.

After pleading guilty, the Probation Office prepared a preliminary PSR which calculated the total offense level for Carroll using the November 1998 Guidelines as follows:

|  | Counts I&II (false visas) | Count III (bribery) |
| --- | --- | --- |
| Base Offense Level | 11 (2L2.1) | 10 (2C1.1(a)) |
| Specific Offense Characteristics | 9 | 16 |
| Adjustment for of Role in Offense (3B1.1(a)) (Organizer) | 4 | 4 |
| Abuse of Trust (3B1.3) | 2 | 0 |
| Sub-Total Offense Level(s) | 26 | 30 |
| Adjustments for Acceptance of Responsibility (§3E1.1(a)) | -3 | -3 |
| Total Offense Level(s) | 23 | 27 |

After receiving the preliminary PRS, both Carroll and the Government filed objections and a presentence conference was held to address the objections. The Government objected to the following in the PSR: (1) the loss amount; (2) a finding that Carroll did not obstruct justice pursuant to section 3C1.1; and (3) giving Carroll a three level reduction for acceptance of responsibility. Carroll meanwhile objected to the Probation Department giving him a four level increase for being a leader/organizer of the scheme pursuant to section 3B1.1(a).

After reviewing the parties' objections, the Probation Department issued a revised PSR which adopts the value of loss calculated by the Government. Under the Government's

4

calculation, the value of loss falls between $5 and $10 million, which, pursuant to section 2F1.1(b)(1)(O), results in a 14 level increase in the base offense level. The revised number is based on the fact that $1.7 million in assets were seized from Carroll. Assuming that Carroll received $6,000 per visa, the $1.7 million translates into 283 fraudulent visas, which when multiplied by $10,000 (the average total cost of each visa), comes to $2,830,000 in total bribes. When added to the 250 fraudulent visas which Carroll attempted to procure, the total loss comes to $5,330,000 ($2,830,000 + [250 * $10,000]). The Government alternatively reaches the $5 to $10 million range by pointing out that the testimony of Eton Cordis shows that Carroll accepted 50 rather than 11 bribes (as used in the preliminary PRS). According to the Government's calculations, these additional bribes when added to the other documented bribes, brings the amount of loss within a $5 to $10 million range.[2]

After the issuance of the revised PSR, the Government filed a Motion for Upward Departure on the grounds that Carroll's scheme resulted in: (1) loss of public confidence in the government under Note 5 to Guideline section 2C1.1; (2) significant disruption of governmental functions under section 2K2.7; (3) threats of violence and destruction of property; and (4) danger to the public welfare/national security pursuant to section 5K2.14. Carroll subsequently filed a brief styled "Sentencing Position Paper and Commentary" responding to the Government's motion for upward departure and the Government's objections to the PSR and seeking a downward departure based on "substantial assistance" pursuant to section 5K1.1 because of the information he allegedly provided to the Government in his proffer sessions.

---

[2]     As for the other issues objected to in the preliminary PRS, the Probation Department stood by its initial findings.

5

Because of the numerous objections to the PSR and grounds for departure for the Guidelines, a lengthy sentencing hearing was held in this matter. The Government called numerous witnesses including Benedict Wolf, the person who replaced Carroll at the non-immigrant visa section, the case agents who investigated Carroll, and a person who worked with the Guyaneese police, to demonstrate the aggravating factors. Carroll, on the other hand, did not put on any witnesses to rebut the Government's evidence of aggravation or to demonstrate any factors in mitigation.

## ANALYSIS

After reviewing the evidence presented at the hearing, the PSR, and the parties' submissions, the Court will now address whether: (I) the Probation Department properly: (A) calculated the loss amount; (B) found that Carroll did not obstruct justice pursuant to section 3C1.1; (C) gave Carroll a three level reduction for acceptance of responsibility; and (D) assigned Carroll a four level increase for being a leader/organizer of the scheme pursuant to section 3B1.1(a); (II) Carroll is entitled to a downward departure based on "substantial assistance" pursuant section 5K1.1 because of the information he allegedly provided to the Government in his proffer sessions; and (III) to grant the Government's motion for an upward departure.

### I. Objections to the PSR

#### A. Value of Loss

As explained in more detail above, the PSR adopts the Government's calculation that the value of loss falls between \$5 and \$10 million, which, pursuant to section 2F1.1(b)(1)(O), results in a 14 level increase in the base offense level. Carroll objects to this valuation on the grounds that the 250 fraudulent visas which Carroll attempted to procure through Wolf should not be

added to the value of loss because the 250 visas were not actually procured and no bribe money was accepted. This argument is contrary to both the Guidelines and established case law. The Background to Guideline section 2C1.1 states that:

> Offenses involving attempted bribery are frequently not completed because the victim reports the offense to authorities or is acting in an undercover capacity. Failure to complete the offense does not lessen the defendant's culpability in attempting to use public position for personal gain. Therefore, solicitations and attempts are treated as equivalent to the underlying offense.

See also United States v. Muhammad, 120 F.3d 688, 699-700 (7th Cir. 1997) (defendant responsible for total value of bribe even though the bribe was not actually accepted). Consequently, this Court OVERRULES Carroll's objection and finds that the Probation Department properly calculated the value of loss between $5 and $10 million, which, pursuant to section 2F1.1(b)(1)(O), results in a 14 level increase in the base offense level.

### B.    Obstruction of Justice

The Government contends that there should have been included in the PSR a two level enhancement for obstruction of justice, pursuant to section 3C1.1, because Carroll has continually attempted to minimize his role in the scheme by failing to admit his managerial role and lied to the Court and the Probation Department by contending that six brokerage accounts, totaling up to $100,000, were not derived from the scheme. The Probation Department disagrees with the Government and finds that Carroll has not "willfully obstructed justice by lying about his finances" in an attempt to favorably affect his sentence.

Section 3C1.1 provides for a two level increase where:

> (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the

> obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense. . . .

Application Note 4 provides a "non-exhaustive list of examples of the types of conduct to which this adjustment applies," and includes "(f) providing materially false information to a judge" and "(h) providing materially false information to a probation officer in respect to a presentence or other investigation for the court." "Material" information is defined as "information that, if believed, would tend to influence or affect the issue under determination." Application Note 6.

Although the Seventh Circuit does not appear to have addressed the issue, a number of other circuits have held that intentionally failing to provide full financial information or attempting to conceal assets from the Probation Department or the sentencing court constitute material falsehoods under section 3C1.1 because the information is relevant to the sentencing court's determination of the defendant's ability to pay a fine or restitution. See United States v. Anderson, 68 F.3d 1050, 1055-56 (8th Cir. 1995) (affirming two level increase, the court held that "attempting to minimize and conceal [] assets" constituted materially false information under 3C1.1); United States v. Nelson, 54 F.3d 1540, 1544 (10th Cir. 1995) (failure to provide information on bank accounts to the Probation Department is material under 3C1.1); United States v. Smaw, 993 F.2d 902, 904 (D.D.C. 1993) (failure to provide full financial information to Probation Department was a material misstatement under 3C1.1).

Here, the Government contends that Carroll obstructed justice under section 3C1.1 by falsely informing this Court, at his plea, and the Probation Department, during its presentence investigation, that six brokerage accounts, totaling up to $100,000, were not derived from the visa scheme. The Government has shown that based on his State Department salary ($225,000 to

$250,000 over 10 years) and his documented spending habits, it is impossible that Carroll could have accumulated over $100,000 in legitimate assets. Apparently acknowledging the futility of claiming these assets as legitimate, Carroll now contends that his assertion that these funds were legitimate "does not reflect a willful attempt to obstruct justice." According to Carroll, the Government took his financial records and in contesting the $100,000 he was simply approximating an amount that he believed to be correct at the time and was not attempting to purposefully mislead either the Court or the Probation Department. The Court finds this excuse lacks merit based on the fact that Carroll kept meticulous track of his investments and the Government made Carroll's financial records available in discovery. Consequently, this Court SUSTAINS the Government's objection and finds that Carroll knowingly misled this Court and the Probation Department in an attempt to affect this Court's forfeiture determination, and therefore, the Court holds that the PSI should have included a two level enhancement for obstruction of justice pursuant to section 3C1.1.

## C.     Acceptance of Responsibility

The Government further objects to the Probation Department's conclusion that Carroll is eligible for a three level reduction for acceptance of responsibility under section 3E1.1. Application Note 4 to section 3E1.1 states that a finding that a defendant has obstructed justice under section 3C1.1 "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct," and therefore, is not eligible for a section 3E1.1 reduction. See also United States v. Ojo, 916 F.2d 388, 393 (7th Cir. 1990) (holding that a defendant is not entitled to a 3E1.1 reduction where the court finds that he obstructed justice under 3C1.1). Consequently,

as explained above, because this Court finds that Carroll has obstructed justice under section 3C1.1, Carroll is not eligible for the three level reduction for acceptance of responsibility.

Moreover, regardless of the obstruction of justice determination, the Government contends that Carroll should not be given a section 3E1.1 reduction because he has continually attempted to minimize his role in the scheme and to shield his assets from forfeiture. In response, Carroll points to the information he gave the Government in his proffer statement as evidence of his acceptance of responsibility.

Under section 3E1.1(a), the court should decrease the defendant's offense level "[i]f the defendant clearly demonstrates acceptance of responsibility of his offense." The defendant, however, is not automatically entitled to a downward departure for simply pleading guilty and bears the burden of demonstrating his acceptance of responsibility to be entitled to reduction under section 3E1.1. United States v. Camargo, 908 F.2d 179, 185 (7th Cir.1990). The sentencing court may deny a departure if the court finds that the defendant attempted to "rationalize and minimize his conduct." United States v. DeFelippis, 950 F.2d 444, 447 (7th Cir. 1991) (affirming denial of a section 3E1.1 departure where the defendant lied to the Probation Department about his employment record). See also United States v. Zaragoza, 123 F.3d 472 , 480-81 (7th Cir. 1997). Courts also have denied a reduction for acceptance of responsibility where the defendant attempted to hide or failed to provide full disclosure of his finances. See United States v. Cojab, 978 F.2d 341, 344 (7th Cir. 1992); United States v. Brigman, 953 F.2d 906, 909 (5th Cir. 1992); United States v. Scott, 915 F.2d 774, 776 (1st Cir. 1990); United States v. Cross, 900 F.2d 66, 69 (6th Cir. 1990).

Here, as explained above, the Court finds that Carroll lied to the Court and the Probation Department by contending that six brokerage accounts, totaling up to $100,000, were not derived from the visa scheme. Even if the Court found that these misstatements were not material, which it does not, the fact that Carroll lied to the Court and the Probation Department is sufficient grounds to deny Carroll a reduction for acceptance of responsibility. See DeFelippis, 950 F.2d at 447 (although false information provided by the defendant was not material and thus not obstruction of justice under section 3C1.1, the fact that the defendant lied to the Probation Department was sufficient grounds to deny a reduction for acceptance of responsibility).

Furthermore, reviewing Carroll's summary of his guilt before this Court during his plea, the Court finds that Carroll attempted to minimize his role in the fraudulent visa scheme. For example, while sufficient for purposes of entering a guilty plea, Carroll's description of his guilt was simply a general, bare-bones description of the visa scheme lacking in any deatil. (June 6, 2001 Tr. at 41-43.) The Court finds this summary is woefully lacking for purposes of a section 3E1.1 reduction. The fraudulent visa scheme lasted almost two years, involved the sale of hundreds of visas, millions of dollars, and, as explained below, was controlled and organized by Carroll and involved numerous other participants, including several Guyana police officials. In his guilty plea, however, Carroll only mentioned one of his co-coconspirators – Haleem Kahn – who is a Co-Defendant in this case and has also pled guilty. Carroll also failed to fully explain the full extent and scope of the fraudulent visa scheme and did not provide the details of his responsibilities. Moreover, Carroll's attempt to minimize and/or rationalize his conduct is evident in his Sentencing Position Paper and Commentary and his counsel's arguments to this Court, which essentially attempt to justify Carroll's actions by stating, without offering any proof

11

whatsoever, that Guyana is a very corrupt country and that State Department employees were already involved in a "pervasive visa scheme before Carroll arrived at his post." (Carroll's Br. at 10.)

Consequently, based on the finding that Carroll obstructed justice and has attempted to minimize and rationalize his criminal conduct, the Court concludes that Carroll not shown that he has sufficiently demonstrated personal acceptance of responsibility for his offense, and therefore, the Court sustains the Government's objection and will not give Carroll a reduction for acceptance of responsibility.

### D.    Leader/Organizer

Carroll objects to the PSR assigning him a four level increase for being a leader/organizer of the scheme pursuant to section 3B1.1(a), which states that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase [the offense level] by 4 levels." The Probation Department found that Carroll was the organizer or leader of a fraudulent visa scheme which operated over two years, netted millions of dollars, and involved at least the following participants: Rajesh Persaud, Donna Dos Santos, Haleem Kahn, Patrick Mentor, Leon Fraiser, Eustace Abraham, Hargobin Motrlry, and Benedict Wolfe.

Although the Guidelines do not provide a precise definition of organizer or leader, Application Note 4 offers some guidance:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing

12

the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

See also United States v. Herrera, 878 F.2d 997, 1000 (7th Cir. 1989). The Background to

section 3B1.1, also provides that "[t]his section provides a range of adjustments to increase the

offense level based upon the size of a criminal organization (i.e., the number of participants in

the offense) and the degree to which the defendant was responsible for committing the offense,"

and "is included primarily because of concerns about relative responsibility." Section 3B1.1,

Background. In making a factual determination of whether a defendant is an "organizer" or

"leader" within the meaning of section 3B1.1, the sentencing court is required to "draw

inferences from a variety of data, including the information in the presentence report and the

defendant's statements and demeanor at the sentencing hearing." Herrera, 878 F.2d at 1000.

Here, Carroll contends that he is not an organizer or leader because he did not exercise

the requisite degree of control over the scheme. Carroll asserts that he was simply a distributor,

working for his Co-Defendant, Haleem Kahn, who actually controlled the operation. As proof,

Carroll points to the fact that he earned a set fee for each fraudulent visa.

After reviewing the evidence, the Court finds that Carroll's contention boarders on the

ridiculous. The evidence shows that not only did Carroll work with Kahn, but also with several

other brokers, including – Rajesh Persaud, Donna Dos Santos, and Patrick Mentor. Carroll set

the price for each visa, took the largest portion of the bribe money, required that the brokers,

including Kahn, follow his explicit instructions on how to channel the applicants to him for

approval of their visa applications, and dictated how the payments would be delivered. Indeed,

the brokers, including Kahn, went to great lengths to follow Carroll's payment instructions, such

13

as bringing the money to Chicago, Illinois, in both cash and gold bars and sometimes directly

depositing money in Carroll's numerous brokerage accounts. Additionally, to protect his

operation from interference and to force customers to pay, Carroll enlisted members of Guyana's

notorious secret police, namely Leon Fraiser, Eustace Abraham, and Hargobin Mortley.

Moreover, when recruiting Wolf into the operation, Carroll told him he was "the boss" and that

he "controll[ed] all the relationships." Consequently, after reviewing the above evidence, this

Court finds that the Probation Department properly assigned Carroll a four level increase for

being a leader/organizer of the scheme pursuant to section 3B1.1(a), and therefore, the Court

OVERRULES Carroll's objection.

## II.    Substantial Assistance

Carroll additionally contends that he is entitled to a downward departure based on

"substantial assistance" pursuant to section 5K1.1 because of the information he provided to the

Government in his proffer sessions. Carroll, however, has misinterpreted section 5K1.1.

Regardless of whether or not this Court finds that Carroll provided "substantial assistance,"

absent a plea agreement, "it is the role of the prosecutor to assess the value of any assistance

provided by the defendant, and any departure for substantial assistance is contingent upon a

motion by the prosecution." United States v. Lezine, 166 F.3d 895, 900-01 (7th Cir. 1999).

Therefore, without a binding plea agreement requiring the Government to move for a departure

under section 5K1.1, unless the defendant can show "an unconstitutional motive," he is not

entitled to a substantial assistance departure if the Government does not make a motion for such

departure. Id.

Here, because the Government is not bound by a plea agreement and Carroll does not claim an unconstitutional motive, he is not entitled to a departure for "substantial assistance" without the Government bringing a motion requesting a departure. The Court has no discretion to sua sponte reduce Carroll's sentence for any substantial assistance he might have provided. Therefore, the Court DENIES Carroll's motion for downward departure.

## III.    Motion for Upward Departure

Generally, the sentencing court must impose a sentence falling within the applicable range set forth in the Guidelines. See Koon v. United States, 518 U.S. 81, 85 (1996). The court may, however, depart from the Guideline sentence if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). See also U.S.S.G. § 5K2.0; Koon, 518 U.S. at 92. Therefore, "[i]n the absence of a characteristic or circumstance that distinguishes a case as sufficiently atypical to warrant a sentence different from that called for under the guidelines, a sentence outside the guideline range is not authorized." U.S.S.G. § 5K2.0, Comment.

Examining departures from the Guidelines, the Supreme Court in Koon explained that the Sentencing Commission intended "the sentencing courts to treat each guideline as carving out a 'heartland', a set of typical cases embodying the conduct that each guideline describes." Koon, 518 U.S. at 93 (quoting U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b)). The Sentencing Commission, however, "did not adequately take into account cases that are, for one reason or another, unusual." Id. Thus, "[w]hen a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may

consider whether a departure is warranted." U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b). Therefore, before a sentencing court is permitted to depart from the Guidelines, the court must find that the case is "unusual" enough for it to fall outside the "heartland" of cases covered in the applicable guideline. See Koon, 518 U.S. at 93.

The Court in Koon set forth the following factors that sentencing courts should use in determining whether an upward departure from the applicable guidelines range is appropriate:

> 1) What features of this case, potentially, take it outside the Guidelines' "heartland" and make of it a special, or unusual, case?
> 2) Has the Commission forbidden departures based on those features?
> 3) If not, has the Commission encouraged departures based on those features?
> 4) If not, has the Commission discouraged departures based on those features?

Koon, 518 U.S. at 95. The Court went on to explain the mechanics of applying this framework:

> If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guidelines heartland. The court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be highly infrequent.

Id. at 95-96 (citations and internal quotations omitted). The Guidelines seek to "aid the court by identifying some of the factors that the Commission has not been able to take into account fully in formulating the guidelines." U.S.S.G. § 5K2.0. These factors are listed in sections 5K2.1 to 5K2.17.

After determining that upward departure is appropriate, the court must next determine to what extent it will depart from the Guidelines. Although there "are no hard and fast rules for determining the extent of an upward departure," the departure must be "reasonable in extent" and should be calculated by "analogy to existing guideline provisions." United States v. Horton, 98 F.3d 313, 317 (7th Cir. 1996). Therefore, the sentencing court should compare the seriousness of the aggravating factor "with the adjustments in the base offense level prescribed by the guideline provisions that apply to conduct most closely analogous to the defendant's offense conduct." Id.

Here, the Government, citing factors listed in the Guidelines which the Sentencing Commission did not take into account, seeks an upward departure on the grounds that Carroll's scheme resulted in: (A) loss of public confidence in the government (section 2C1.1, Note 5); (B) significant disruption of government functions (5K2.7); (C); danger to the public welfare (2K2.14); and (D) use of threats of violence and the destruction of property (5K2.5). The Court will discuss each of these issues in turn and then determine what extent, if any, the Court will depart upward for each ground it finds appropriate for upward departure.

### A.    Loss of Public Confidence in the Government

Application Note 5 to Guideline section 2C1.1, which is the section applicable to the offering, giving, soliciting, or receiving a bribe by a public official, states that: "[w]here the court finds that the defendant's conduct was part of a systematic or pervasive corruption of a governmental function, process, or office that may cause loss of public confidence in government, an upward departure may be warranted." Although the Seventh Circuit has not specifically addressed the application of Note 5 in granting an upward departure, several other circuits, in affirming upward departures under Note 5, have held that the district court must

determine whether the corruption: (1) was systematic or persuasive; and (2) "may" result in a loss of public confidence in the government. United States v. Reyes, 239 F.3d 722, 744-45 (5th Cir. 2001); United States v. Shenberg, 89 F.3d 1461, 1476 (11th Cir. 1996). In applying the second prong, the court need only determine if the corrupt conduct "may" result in loss of public confidence, not whether the conduct actually resulted in the loss of public confidence. Id.

In Reyes, 239 F.3d at 733, 744-45, the Fifth Circuit affirmed the district court's two level upward departure under Note 5 of section 2C1.1 for a city councilman convicted of bribery and conspiracy to commit bribery. The Fifth Circuit found that "systematic" is defined as "methodical in procedure or plan and marked by thoroughness and regularity," and that "pervasive" means to "become diffused throughout every part." Id. at 744, n.15. The district court looked at the defendant's role and the scope of the corruption and found that the evidence showed that the defendant was the organizer of at least five "criminally responsible participants." Id. at 744. Therefore, the court found that the defendant's "role in the conduct is in accord with the meaning of 'systematic,' 'persuasive,' or both." Id. As for the second factor, the court looked in part at the fact that "widely reported media coverage of this case . . . has fueled the public perception of corruption of [the] the city council." Id. at 745.

Similarly, in United States v. Reece, 139 F.3d 895, 1998 WL 116163, at *2 (4th Cir. March 17, 1998), in an unpublished decision, the Fourth Circuit affirmed a two level upward departure under Note 5 of section 2C1.1 of a defendant who was in charge of the air operation section of the Bureau of Alcohol, Tobacco and Firearms ("ATF"). The defendant pled guilty to defrauding the ATF by submitting false invoices for the lease of airplanes which were never actually leased. Id. at *1. In determining that the scheme "amounted to systematic or pervasive

18

corruption," the court noted that the scheme resulted in a loss of $1.45 million to the ATF, spanned five years, and involved 22 fraudulent "submissions." Id. at *2. The court also found that there was "substantial evidence" supporting the finding that the scheme "may cause the loss of public confidence in government" in that "there were multiple news reports" of the fraud. Id. Additionally, the court found that persons in leadership roles who engage in such fraudulent conduct generally cause the loss of public confidence in the government. Id.

Here, after reviewing the evidence presented at the hearing, in the PSR, and the parties' submissions, the Court finds that the fraud perpetrated by Carroll was both "systematic" and "pervasive" and "may cause loss of public confidence in government." The evidence showed that during the almost two year scheme, Carroll sold hundreds of fraudulent visas. The scheme encompassed numerous participants, including Guyana officials and foreign nationals working at the U.S. embassy in Guyana. As explained above, the total value of the visas that Carroll sold and attempted to sell surpassed $5 million. Also, as explained above, Carroll was the organizer of the scheme in that he carefully planned and controlled the conspiracy by directing the brokers how to submit the fraudulent visa applications, what type of false supporting documents to use, how to provide him with the names of the applicants for the fraudulent visas, and specifically directed the brokers how to deliver payment to him.

As for the second element, the evidence demonstrated that Carroll's arrest and the details of his scheme were covered by the media in both the United States and Guyana. Moreover, by issuing visas to persons whom he knew were using false identities, Carroll knowingly let persons into the United States without running background checks on them to determine if they were criminals or terrorists. Furthermore, as in Reece, because Carroll used a position of importance

(vice counsel who had discretion to issue visas), it is a fair assumption that his fraud may cause a loss of public confidence in the government.

Accordingly, because this Court finds that the fraud perpetrated by Carroll was both "systematic" and "pervasive" and "may cause loss of public confidence in the government," pursuant to Note 5 of section 2C1.1, the Court GRANTS the Government's motion for two level upward departure. Given the effect and degree of Carroll's conduct, as compared to <u>Reyes</u> and <u>Reece</u>, which affirmed two level departures, this Court finds that a two level departure is reasonable here.

## B.    Significant Disruption of Governmental Functions

Additionally, Guideline section 5K2.7 gives the court the discretion to depart upward from the Guidelines:

> If the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected. Departure from the guidelines ordinarily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with a governmental function is inherent in the offense, and unless the circumstances are unusual the guidelines will reflect the appropriate punishment for such interference.

Here, Carroll pled guilty to bribery of a public official, and therefore, he is not eligible for a departure under section 5K2.7 unless the disruption of the government "was so atypically great as to exceed the level of interference inherent in the offense." <u>United States v. Sarault</u>, 975 F.2d 17, 19-20 (1st Cir. 1992). <u>See also United States v. Velez</u>, 113 F.3d 1035, 1039 (9th Cir. 1997) ("[b]y definition one necessarily disrupts a legitimate government function when bribing an official"). Consequently, ths Court will examine whether the visa scheme resulted in a greater

20

disruption to the government than that normally associated with an average, run-of-the-mill bribery case.

After reviewing the evidence, this Court finds that Carroll's fraudulent visa scheme did more damage to governmental functions than the normal bribery case. Carroll's conduct severely disrupted the diplomatic relations between the United States and Guyana, in that both trade and travel between the two countries was severely curtailed during the investigation of Carroll's scheme. Furthermore, the operations of the U.S. Embassy were severely affected beyond the non-immigrant visa section, in that the whole embassy's operations were disrupted due to security threats from the negative publicity that Carroll's conduct had on the perception of the United States by the Guyana people. The non-immigrant visa section was completely shut down for over two months and the embassy itself was also closed for a period due to Carroll's actions. Furthermore, because of the scheme, several embassy employees were shot at with guns and were required to take extra security precautions. Accordingly, given these severe consequences, this Court finds that Carroll's scheme significantly disrupted governmental functions well beyond that which is taken into account in the Guidelines for a typical bribe of a public official, and therefore, the Court grants the Government's motion for an upward departure under section 5K2.7. Given the affect that Carroll's actions had on the United States Government, this Court finds that an increase in one level is reasonable.

### C.    Danger to Public Welfare

Guideline section 5K2.14 gives the court the discretion to depart upward from the guidelines "[i]f national security, public health, or safety was significantly endangered." Although the Seventh Circuit has not specifically addressed this section, other circuits have held

that the danger caused by the defendant need not actually have occurred, only that there was a "potential danger" to national security or public safety. See United States v. Todd, 909 F.2d 395, 397 (9th Cir. 1990). See also United States v. Roth, 934 F.2d 248, 251 (10th Cir. 1991). In Todd, 909 F.2d at 397-98, although the Ninth Circuit found that the district court did not adequately explain the reasons for the extent of the upward departure, the court upheld the granting of a departure under section 5K2.14 for a defendant who pled guilty to unlawful possession of military identification cards. The court noted that the stolen cards posed a grave danger to national security because they enabled individuals without proper clearance to enter military installations and get access to military equipment and classified information. Id. Similarly, in Roth, 934 F.2d at 251, the Tenth Circuit found that the district court properly departed upward in sentencing a defendant, who was a United States Air Force police officer and pled guilty to theft of military equipment. In granting the departure, the court noted that the theft "could have endangered national security." Id.

Here, as in the cases above, this Court finds that the Government has shown that the fraudulent visa scheme posed a potential and significant danger to national security. In less than two years, Carroll issued hundreds of fraudulent visas to person whom he knew were using false identities and documents. By issuing visas to persons whom he knew were using false identities, Carroll knowing let persons into the United States without running proper background checks on them to determine if they were criminals or terrorists. As a vice counsel in the non-immigrant visa section, one of Carroll's main responsibilities was to run background checks on individuals who applied for visas. Additionally, Carroll knew or should have known that most people entering the United States with these visas would not return to Guyana, but, instead, intended to

22

stay in the United States indefinitely. Because Carroll issued over 3600 visas, the Government cannot possibly track all of the persons down to determine if they have any criminal intentions. In fact, persons who entered the country with Carroll's visas have since been arrested and charged with rape and drug possession with intent to deliver. Moreover, at least one United States citizen who was in Guyana and had warrants for his arrest in the United States was able to get back into the United States undetected by using a false name and a fraudulent visa supplied by Carroll.

Consequently, given the above facts, this Court finds that Carroll's actions could easily have threatened national security, and therefore, the Court GRANTS the Government's motion for an upward departure under section 5K2.14. Comparing Carroll's conduct to section 2L2.1, which calls for a four level increase if the defendant "had reason to believe that a [] visa was to be used to facilitate the commission of a felony," the Court finds that a two level increase is reasonable here. Although Carroll might not have had reason to believe that the persons were going to commit crimes in the United States, it was certainly possible that by allowing persons into the country without running proper background checks that some of the persons who got their visas through bribery would commit crimes in the United States.

### D.  Use of Violence and Threats of Violence and Damage to Property in Furtherance of the Visa Scheme

Finally, the Government contends that Carroll should receive an upward departure because in the operation of the visa scheme, he used threats of violence (section 5K2.0) and caused the destruction of property (section 5K2.5).

Because the threat of violence is not a specific factor listed by the Sentencing Commission, to grant an upward departure here, the Court, as explained in more detail above, must find that this case is "unusual" enough for it to fall outside the "heartland" of cases covered in the applicable Guideline. See Koon, 518 U.S. at 93. The Guideline sections which control Carroll's sentencing are section 2C1.1 (bribery) and section 2L2.1 (production of false visa documents). Neither of these sections, however, provide for an increase in offense level for the threat of violence made in connection with a bribery scheme or the production of false visa documents. Therefore, the Court must examine these threats to determine if they rise to a level which should take this case out of the heartland.[3]

After reviewing the evidence, this Court finds that Carroll's fraudulent visa scheme was not your typical bribery case where a public official is offered a bribe in exchange for making a favorable decision. To protect his fraudulent visa operation, Carroll enlisted the assistance of several corrupt Guyanese police officers – Leon Fraiser and Eustace Abraham, who were members of the notoriously corrupt, brutal, and feared paramilitary arm of the police force, often referred to as the "black clothes" and the "death squad" because of their black uniforms.

While working for Carroll, these police officers used threats of violence against anyone whose actions could potentially expose the visa operation or who refused to pay the bribe. For example, Hargobin Motley testified that Carroll informed Fraiser that an individual by the name

---

[3]        The Government also contends that section 5K2.5 is applicable. This section provides that "[i]f the offense caused property damage or loss not taken into account within the guidelines, the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the extent to which the harm was intended or knowingly risked and on the extent to which the harm to property is more serious than other harm caused or risked by the conduct relevant to the offense of conviction."

of Mr. Shabazz was threatening the visa operation by calling Carroll while he was at work at the embassy. Subsequently, Fraiser arrested Mr. Shabazz and brought him to the headquarters of the "black shirts." Motley testified that the headquarters is "one of the most feared place[s]" in Guyana because of the beatings that occur there at the hands of the police. After Mr. Shabazz arrived at the headquarters, Fraiser had Motley call Carroll to let him know Mr. Shabazz was in custody. About ten minutes later, Carroll showed up at the headquarters and began to yell and threaten Mr. Shabazz and instructed him to write an "apology letter" so that Carroll could "win back his confidence at his workplace."

Similarly, Mortley testified that Carroll called Fraiser to report that Mr. Vijai Deo had called his boss at the embassy to report the sale of visas by Carroll. Carroll proposed that the police "set up" Deo, so that they could arrest him. Subsequently, Fraiser planted evidence at Deo's home and had an arrest "bulletin" issued. After Deo was arrested, Fraiser call Carroll to ask him what if anything he wanted done to Deo. Carroll, however, did not want anything done to him because he was afraid that any publicity might attract the attention of embassy personnel.

Additionally, Benedict Wolf, who took over Carroll's position at the non-immigrant visa section and posed as a corrupt official, testified that he told Carroll he was afraid that he was going to be exposed for selling visas by Roy Singh. In response, Carroll said he was going to "send someone to talk with [Singh]," and that he "wouldn't have anybody killed, but [] would have them beaten up." Carroll subsequently arranged to have his "thugs" show up at Singh's apartment and destroy $300 worth of his personal belongings as a message that he was not to interfere in the visa scheme.

Consequently, based on the use of threats of violence and the destruction of property, this Court finds that this bribery case is "unusual" enough for it to fall outside the "heartland" of cases covered in the applicable guideline, See Koon, 518 U.S. at 93, and therefore, the Court GRANTS the Government's motion for upward departure based on the use of the threat of violence and the destruction of property in the operation and the furtherance of the visa scheme. In determining the extent of the departure, the Court looks first at section 2B3.2 which is cross referenced in section 2C1.1. Under section 2B3.2, which applies to "extortion by force or threat of injury," a two level increase is required if the offense involved an express or implied threat of death, bodily injury, or kidnaping. As explained above, Carroll used the "black shirt" police squad on at least two occasions to threaten persons who jeopardized the visa scheme. Thus, a upward departure of two levels is appropriate for the threats of violence and the destruction of property.

## IV. Final Calculations under the Guidelines

Based on the above rulings, the Court calculates Carroll's total offense level as follows:

|  |  | Count III (bribery) |
|---|---|---|
| Base Offense Level | 10 | (2C1.1(a)) |
| Specific Offense Characteristics |  |  |
| Involved more than One Bribe | 2 | (2C1.1(b)(1)) |
| Value of Bribes between $5-$10 million | 14 | (2C1.1(b)(2)(A) and 2F1.1) |
| Adjustment for of Role in Offense (Organizer/Leader) | 4 | (3B1.1(a)) |
| Adjustment for Obstruction of Justice | 2 | (3C1.1) |
| Sub-Total Offense Level(s) | 32 |  |
| Adjustments for Acceptance of Responsibility | 0 | (3E1.1(a)) |
| Upward Departures |  |  |
| Loss of Public Confidence in the Government | 2 | (2C1.1, Note 5) |
| Significant Disruption of Gov. Functions | 1 | (5K2.7) |
| Danger to the Public Welfare | 2 | (2K2.14) |
| Use of Threats of Violence and Resulting Property Damage | 2 | (5K2.5) |
| Total Offense Level(s) | 39 |  |

## CONCLUSION

For the foregoing reasons, this Court: (1) OVERRULES Defendant Carroll's objections to the PRS; (2) DENIES his Motion for an Downward Departure; (3) SUSTAINS the Government's objections to the PSR; and (4) GRANTS the Government's Motion for an Upward Departure.

It is so ordered.

**ENTER**

*Blanche M. Manning*
**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

**DATE:**_____